IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHERYL RIES,                                    )
                                                )
Plaintiff,                                      )
                                                )
v.                                              )
                                                )        Case No.  4:12-CV-01018-SPM
                                                )
                                                )
CAROLYN W.  COLVIN,[1]                           )
Acting Commissioner of Social Security,         )
                                                )
Defendant.                                      )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the application of Plaintiff Sheryl Ries ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 16).  Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

## I.       PROCEDURAL HISTORY

On February 17, 2010, Plaintiff applied for SSI, alleging disability beginning March 1, 2006.  (Tr. 99-104).  That application was initially denied on June 28, 2010.  (Tr. 61).  On July 12, 2010, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ).  (Tr. 73).  On

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

January 26, 2011, after a hearing, the ALJ issued an unfavorable decision.  (Tr. 15-26).  On February 23, 2011, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council.  (Tr. 9-13).  On April 9, 2012, the Appeals Council declined to review the decision.  (Tr. 1-4).  Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.     FACTUAL BACKGROUND

### A. BACKGROUND

On January 14, 2011, Plaintiff testified at a hearing before an ALJ.  Plaintiff was 34 years old at the time, unmarried, with three children.  (Tr. 33).  She was residing in a hotel with two of her children, receiving aid from Pathways Community Behavioral Health of Rolla, Missouri ("Pathways").  (Tr. 34).  She had obtained a GED and completed some college.  (Tr. 35).  She had not worked for some years, but she had worked in the past as a grill cook and a nurse's aide. (Tr. 35).

Plaintiff testified that she has mental conditions for which she receives treatment, including bipolar disorder and post-traumatic stress disorder ("PTSD").  (Tr. 37, 49-50).  She testified that it has been several years since she left the house alone, and that when she tried she had a severe panic attack.  (Tr. 46).  She also testified that she feels nervous around people, scratches her hands to relieve tension, keeps the shades closed and windows locked at home, and does not go outside or let the kids go out.  (Tr. 47).  She reported having had a severe anxiety attack in the summer of 2010 while at a baseball game, saying that it caused her left side to become tingly and numb.  (Tr. 48).

Plaintiff testified that she has manic phases where she will buy many things she does not need because they smell good and the smell calms her down.  She feels compelled to buy things in doubles or in certain numbers.  (Tr. 49).  She also testified that she is upset by sticky spots or little messes in the house and that she cleans her house often.  During the down episodes of her bipolar disorder, Plaintiff sleeps a lot, has flu-like symptoms, and is sometimes irritable and moody.  (Tr. 50).  Her PTSD also causes nightmares that wake her up; she is on sleeping medication.  (Tr. 50-51).  She also has memory problems and confusion.  (Tr. 52).

Plaintiff testified that her mental symptoms began at age seven, but that she did not get treatment at that time.  She was first seen at Pathways in 2006.  She takes medication and testified that she has been doing so for perhaps thirteen years.  (Tr. 37).  Plaintiff testified that the medications improve her mental state in some respects, "keep[ing her] mood stable" and helping her sleep and controlling anxiety, but they are not fully effective at eliminating her symptoms. (Tr. 38).  She has some side effects from her medications, including fatigue, outbursts of anger, and hair loss.  (Tr. 52-53).

Plaintiff further testified that she has been diagnosed with polycystic ovarian syndrome ("PCOS"), for which she has been receiving treatment since 2010.  (Tr. 38-39).

On June 28, 2010, Plaintiff was involved in a car accident.  (Tr. 39-40).  She has received treatment for soft-tissue damage from that accident, including prescriptions for muscle relaxers and pain medication.  She also testified that she has a degenerative disk disease but that she has not been seen by a spinal specialist in some years.  (Tr. 40).

Plaintiff testified that her daily routine involves getting her kids off to school and then cleaning her residence.  Several days a week, her Community Support Services ("CSS") worker from Pathways comes and takes her out to do errands such as grocery shopping.  (Tr. 41).

Plaintiff often does little during the day; she testified that her main activities include downloading music on her phone and "sit [ting] around the house with the kids."  (Tr. 42). Plaintiff testified that she and her boyfriend "sit and talk and listen to music," but that they rarely go out, although sometimes they will go to the video store to rent movies.  (Tr. 44).  Plaintiff's grandmother comes over to visit several times per week.  (Tr. 45).  In a Function Report completed in March 2010, Plaintiff indicated that she gets her kids off to school, does their laundry, and cooks meals for them.  (Tr. 151-53).  She also goes shopping for one or two hours a week, and her friends come over "all the time" to watch movies and talk.  (Tr. 154-55).

### B. RECORDS OF TREATING SOURCES

#### 1. RECORDS OF PATHWAYS COMMUNITY BEHAVIORAL HEALTH

On November 16, 2006, Plaintiff was seen at Pathways, where she presented with depression, anxiety, and mania.  She reported symptoms of agitation, irritability, excessive worry, paranoia, concentration, tension, excessive guilt, weight gain, grandiosity, pressured speech, racing thoughts, compulsive spending, fatigue, restlessness, sleep disturbances, hypersomnia, and insomnia.  (Tr. 309-10).  She had recently been evicted from her apartment for failure to pay rent due to compulsive spending.  (Tr. 310).  She reported a history of sexual, physical, and emotional abuse.  (Tr. 312).  The clinician noted that Plaintiff's affect was blunted and constricted with depressed mood; that she was experiencing feelings of hopelessness, worthlessness, and worry; and that she exhibited poor judgment.  (Tr. 314).  The clinician assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 40[2] and noted diagnoses

---

[2] The Global Assessment of Functioning (GAF) Scale is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental*

of bipolar disorder, PTSD, depression, obesity, and lumbar disk disease.  (Tr. 316).  Plaintiff was five feet, eight inches tall and weighed 250 pounds.  (Tr. 314).

On January 7, 2009, Plaintiff returned to Pathways,[3] presenting with feelings of distraction, hypersomnia, lack of motivation, and anhedonia.  She weighed 212 pounds.  Her hygiene, eye contact, and speech were normal.  (Tr. 280).  It was noted that she was taking lithium,[4] Ativan,[5] Topamax,[6] and Celexa.[7] (Tr. 281).

On February 18, 2009, she returned to Pathways, reporting an episode of explosive anger with her friend.  The clinician's notes indicate that the apparent cause was stress over her relationship with her son.  Plaintiff's hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 282).

---

*Disorders (DSM-IV)*, 32 (4th ed. 1994).  A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoid friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* 32.

[3] There are no medical records in evidence for the period between November 16, 2006, and January of 2009, from Pathways or elsewhere.

[4] Lithium is used to treat and prevent episodes of mania in people with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html.

[5] Ativan is a trade name for lorazepam and is used to relieve anxiety.  Lorazepam is in a class of medications called benzodiazepines. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

[6] Topamax is a trade name for topiramate and is used to treat seizures and to prevent migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html.  Plaintiff has indicated that she takes Topamax to help with her bipolar disorder.  (Tr. 166).

[7] Celexa is a trade name for citalopram and is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

On April 1, 2009, Plaintiff reported distress over her weight and angry and aggressive episodes with her partner.  The clinician noted that Plaintiff was tearful, sad, and depressed.  (Tr. 284).

On April 9, 2009, Plaintiff reported that she was developing coping skills to manage her anger.  An increase in her dose of Topamax was reported to be helping her a great deal, though it was resulting in some hair loss.  Her hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 286).

On April 22, 2009, Plaintiff reported episodes of anger, irritability, and aggressiveness, and said that the police had recently been called to her house to respond to complaints of yelling. Plaintiff's hygiene, eye contact, and speech were normal, but her mood was irritable and angry. (Tr. 288).

On April 27, 2009, Plaintiff reported that her anger and irritability were somewhat better. Her hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 290).

On May 11, 2009, Plaintiff complained of worsened anxiety symptoms with panic attacks, nervousness, and social anxiety.  It was noted that she had tested positive for Epstein-Barr syndrome, which the clinician suggested probably explained her chronic fatigue.  Plaintiff's hygiene, eye contact, and speech were normal, but her mood was edgy and worried.  (Tr. 292).

On May 21, 2009, Plaintiff complained of weight gain and anxiousness "about being fat." Her anger was better, but she said she had been arguing with her boyfriend.  The clinician noted that, at 227 lbs., Plaintiff was obese.  Her eye contact and speech were normal, and her mood was "okay."  (Tr. 294).

On June 10, 2009, Plaintiff reported that she had "been doing fine."  She had lost some weight and reported that her anxiety and mood were "under control."  Plaintiff's hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 296).

On July 1, 2009, Plaintiff reported that she had been experiencing panic attacks and felt like she was "losing it mentally."  The clinician noted that Plaintiff was tearful, sad and depressed, with a restricted affect.  It was also noted that Plaintiff's father had recently passed away.  (Tr. 297).

On July 22, 2009, Plaintiff complained of some stress over handling her children in the grocery store, but she reported an overall better mood and no crying episodes.  Plaintiff's hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 299).

On September 2, 2009, Plaintiff reported that she had been experiencing migraine headaches and was suffering from the flu.  She reported that her mood was stable.  Her hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 303).

On October 14, 2009, Plaintiff again complained of migraines, and she reported that her mood was going downhill and she was crying easily.  The clinician noted the presence of interpersonal stresses and recommended an increase in Plaintiff's dose of Celexa.  Plaintiff's hygiene, eye contact, and speech were normal, and her mood was "okay."  (Tr. 305).

Plaintiff returned to Pathways,[8] reporting that the increase in her dose of Celexa had helped to improve her mood.  She reported that her depression had improved and her tearfulness was gone; however, she had continuing social anxiety.  Her hygiene, eye contact, and speech were normal, but her mood was anxious.  (Tr. 307).

---

[8] The date of this visit is unclear from the record.

On October 29, 2009, Plaintiff underwent an annual Community Psychiatric Rehabilitation Center ("CPRC") Assessment performed by Gene Schaefer, MA, the CSS Supervisor at Pathways. (Tr. 266-79). She reported anxiety about leaving the house, inability to be around people, getting depressed all the time, keeping her curtains closed and her doors locked. (Tr. 267-68). It was noted that Plaintiff had moderate anxiety, moderate depression, and moderate delusions, including paranoia. (Tr. 267). On mental status examination, her affect was depressed; she reported that her mood was "like a roller coaster"; she had attention deficit/hyperactivity disorder and procrastination; she reported memory loss, obsessions, and compulsions; and she reported a "weird" sleep pattern. (Tr. 268-69). However, her appearance, manner, speech, attitude, dress, grooming, eye contact, productivity, continuity, orientation, and judgment were deemed normal. (Tr. 268). Plaintiff reported past episodes of suicidal ideation and 20 past attempts at suicide; she indicated that she had thought about suicide two or three times in the last year, most recently two or three weeks ago. (Tr. 269-70). Her physical conditions were listed as obesity, a "back/spine/limb condition," and PCOS. (Tr. 274). Plaintiff was assessed as having bipolar affective disorder; PTSD; and sedative, hypnotic, or anxiolytic abuse. She was assigned a GAF score of 45.[9] (Tr. 275-76).

On March 18, 2010, Plaintiff returned, complaining of anxiety and mania. Her anxiety medications were increased, though the clinician noted that she appeared "quite calm." (Tr. 320).

On April 7, 2010, Plaintiff returned to Pathways, reporting some irritability and angry exchanges with family members. Dr. Faheem Arain, M.D., noted that, though Plaintiff had

_____

[9] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

experienced anxiety attacks, they were getting better over time with the help of Celexa. Plaintiff's hygiene, eye contact, and speech were normal, but her mood was anxious. Dr. Arain prescribed her Pristiq[10] to help with her anxiety. (Tr. 322).

On May 5, 2010, Plaintiff returned after she stopped taking her Pristiq due to nausea and vomiting. Once she stopped the medication, these symptoms abated. Plaintiff reported that her mood was "stable," and that her lithium was helping with the depression and manic episodes. Her hygiene, eye contact, and speech were normal, and her mood was "okay." (Tr. 324).

On June 16, 2010, Plaintiff returned, complaining of the flu and feelings of tiredness and irritability. Notes state, "No major crisis [was] reported." Plaintiff's hygiene, eye contact and speech were normal, and her mood was "okay." (Tr. 414).

On August 27, 2010, Plaintiff complained of feeling down and depressed, sleeping most of the day, and feeling afraid of people. The clinician noted that Plaintiff's affect was blunted. Her medications were adjusted. (Tr. 413).

### 2. RECORDS OF THE COMMUNITY PSYCHIATRIC REHABILITATION CENTER

On September 23, 2010, Plaintiff visited the Community Psychiatric Rehabilitation Center in Rolla, MO, where she saw Dr. Shirley Eyman, M.D. Plaintiff reported feeling sad and said she thought that her medications were not working. She also told Dr. Eyman that "she fears other people because they might not like her and might spread rumors and lies." The doctor described her as "pleasant and cooperative," and said her "affect [was] of full range." The doctor suggested discontinuing lithium because Plaintiff reported that it was not working but that the Topamax was helping her bipolar symptoms. (Tr. 411).

---

[10] Pristiq is a trade name for desvenlafaxine, which is used to treat depression/anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608022.html.

### 3. RECORDS OF THE OB/GYN CENTER AT PHELPS COUNTY REGIONAL MEDICAL CENTER

Between January and October 2009, Plaintiff saw Dr. Srilakshmi Vuyyuru, M.D., in the OB/GYN department at Phelps County Regional Medical Center ("PCRMC") on several occasions.  (Tr. 227, 231-33, 235, 237-38, 240, 350, 360).  Plaintiff complained at some of these visits about bleeding, abdominal pain, and pain during periods, though she reported in September 2009 that "Motrin completely relieves her pain," and she reported in October 2010 that her pain had improved.  (Tr. 237, 235, 232, 231).  Dr. Vuyyuru diagnosed Plaintiff with uterine fibroids, but Plaintiff refused any substantial intervention.  (Tr. 235).  It appears that Dr. Vuyyuru also diagnosed insulin-resistant PCOS and counseled Plaintiff about insulin and metformin.[11]  (Tr. 231, 305).

### 4. RECORDS FROM OTHER TREATING SOURCES

On January 26, 2009, Plaintiff saw Dr. Leticia Alaniz, M.D., at PCRMC, to establish care.  Plaintiff complained of "knots" in her abdomen and throat.  She also complained of occasional soreness in her abdomen, nausea, diarrhea, constipation, and hair loss.  (Tr. 217).

On January 31, 2009, Plaintiff was seen at the PCRMC emergency department for dizziness.  (Tr. 363-64).  On February 5, 2009, she was seen at the same place for vertigo.  (Tr. 361-62)

On April 29, 2009, Plaintiff returned to Dr. Alaniz due to complaints of seizures.  Dr. Alaniz noted that Plaintiff was suffering some psychiatric distress due to increased levels of stress (family problems), and that she had not experienced real seizure activity but possibly a psychotic episode.  Dr. Alaniz also noted that Plaintiff's bipolar disorder was not being well

---

[11] Metformin is in a class of drugs called biguanides, which are generally prescribed to help control diabetes.  (http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html).  Plaintiff was prescribed Metformin to help with her PCOS.

treated by her current medications and recommended that she consider inpatient psychiatric care. Plaintiff complained of various side effects from her medications, including decreased concentration and hair loss.  (Tr. 213).  Dr. Alaniz noted that Plaintiff was "appropriate in speech [and] manner, [and] answered questions appropriately."  (Tr. 214).

Plaintiff was seen at the emergency department at PCRMC on August 18, 2009, complaining of numbness in her trunk and migraines related to having recently increased her dose of Topamax.  She was diagnosed with thoracic neuralgia and migraine headaches.  The attending physician noted nothing abnormal in examination notes but ordered a CT scan of Plaintiff's head, which was performed on August 18 with normal results.  (Tr. 352).

On September 17, 2009, Plaintiff returned to Dr. Alaniz, complaining of abdominal pain with intermittent swelling, which she said had begun two months prior.  Dr. Alaniz noted that Plaintiff was taking Topamax, prescribed by her psychiatrist, which had been causing migraine headaches since it was begun three months prior.  The doctor also noted that Plaintiff reported eating too much and feeling full or constipated.  Dr. Alaniz prescribed Elavil[12] for the migraines and suggested a liver function test and fasting lipid profile.  (Tr. 209).  The lipid profile indicated that Plaintiff's triglyceride level was in the "borderline-high" range, and she was directed to work on her diet and exercise regimen.  (Tr. 218).

On October 7, 2009, Plaintiff was seen at the emergency department at PCRMC, complaining of a headache, earache, cough, congestion, and nausea which had begun the day before.  The clinical impression was "headache."  (Tr. 347-48).

On June 28, 2010, Plaintiff returned to the emergency department at PCRMC following a car accident in which her head hit the windshield.  She presented with head and neck injuries,

---

[12] Elavil is a trade name for amitriptyline, a tricyclic antidepressant which is also used to treat migraine headaches.  (http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html).

including a hematoma in the back left side of her head, a contusion on her scalp, and a sprained neck.  (Tr. 371-72).  An X-ray of the cervical spine revealed no damage to the vertebrae or disks. (Tr. 373).

On June 30, 2010, Plaintiff visited PCRMC and saw Dr. Lee, complaining of pain in her head and neck.  Dr. Lee noted that she was suffering from PCOS and bipolar disorder, and he recommended a CT scan for her headaches.  Dr. Lee further noted Plaintiff's fatigue, malaise, tinnitus, sore throat, rash, palpitations, nocturia, incontinence, cough, syncope, and obesity. Plaintiff weighed 218 pounds.  (Tr. 206).

On August 9, 2010, Plaintiff saw Dr. Alaniz, complaining of "pain all over" following her car accident.  Specifically, she complained of pain in her neck, lower back, and shoulder, pain and ringing in her left ear, numbness in her foot, malaise, vertigo, and headaches.  Plaintiff described her pain as a six on a scale of one to ten.  (Tr. 381).  Dr. Alaniz advised Plaintiff to use anti-inflammatories, a heating pad, and strengthening/stretching exercises; she felt that a neurology referral would be premature.  (Tr. 383-84).  Dr. Alaniz stated that she suspected that Plaintiff's back muscles were still healing from her car accident.  (Tr. 384).

### C. OPINION EVIDENCE

#### 1. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF MARK ALTOMARI, PH.D. – FEBRUARY 17, 2009

On February 17, 2009, Dr. Mark Altomari completed a Psychiatric Review of Plaintiff's medical history.  He noted a history of affective and anxiety-related disorders, including bipolar disorder and PTSD.  (Tr. 192-202).  He indicated that Plaintiff experienced mild limitations in activities of daily living; moderate difficulties in maintaining social functioning; and moderate

difficulties in maintaining concentration, persistence, or pace.  Plaintiff had experienced no extended episodes of decompensation.  (Tr. 200).

On the same date, Dr. Altomari conducted a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 341-43).  He found that Plaintiff retained the ability to understand, remember, and carry out simple directions; could relate appropriately to co-workers and supervisors in small numbers and for short periods of time; and could adapt to routine changes in the workplace and make simple work-related decisions.  (Tr. 343).  He also found that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting.  He found no significant limitations in the other areas assessed, and no marked limitations in any of the areas assessed.  (Tr. 341-42).

### 2. PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF STANLEY HUTSON, PH.D. – JUNE 28, 2010

On June 28, 2010, Dr. Stanley Hutson completed a Psychiatric Review Technique Form.  (Tr. 326-37).  The doctor determined that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 334).

On the same date, Dr. Hutson completed a Mental RFC Assessment.  (Tr. 338-340).  He found that Plaintiff retained the ability to understand and remember simple instructions; could

13

carry out simple work instructions; could maintain adequate attendance and sustain an ordinary routine without special supervision; could interact adequately with peers and supervisors in small numbers and for short periods of time; and could adapt to most usual changes common to a competitive work setting.  (Tr. 340).  He also found that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in the work setting; and the ability to travel in unfamiliar places or use public transportation.  He found no significant limitations in any of the other areas assessed, and no areas of marked limitation.  (Tr. 338-39).

### 3.   FUNCTIONAL SKILLS EVALUATION BY COMMUNITY SUPPORT SPECIALIST MELISSA HORIMOTO, B.A. – OCTOBER 8, 2010

On October 8, 2010, Plaintiff underwent a Functional Skills Evaluation at Pathways, performed by her Community Support Specialist, Melissa Horimoto, B.A.  Ms. Horimoto found that Plaintiff had no significant difficulties in the areas of personal hygiene, personal nutrition, addressing her medical needs, cooking, maintaining a residence, housekeeping, shopping, personal transportation, communicating, caring for children and/or pets, relating to employers, relating to coworkers, relating to law enforcement, or performing "work-like activity."

However, Ms. Horimoto indicated that Plaintiff had significant difficulty in the areas of financial management, handling paperwork, relating to family members, relating to friends, relating to neighbors, interacting with strangers, interacting with landlords, making decisions, adapting to/coping with  change, and making necessary behavioral adjustments in response to change. Ms. Horimoto noted that Plaintiff had difficulty in these areas due to memory problems, difficulty coping with conflict, inability to express needs, poor communication skills, easy exploitability, inability to manage conflict, poor decision-making skills, regression, inability to take action, difficulty managing anxiety, difficulty asking for help, and difficulty learning/using new information.  (Tr. 391-98).  Ms. Horimoto further noted that Plaintiff's limitations include social phobia, depression, anxiety, panic attacks, significant personal stressors, lack of resources/support, history of mental illness, history of drug abuse, past suicide attempts, isolation, hypersomnia, crying spells, paranoia, back problems, past physical abuse, past sexual abuse, and PTSD.  (Tr. 399-410).

### D. VOCATIONAL EVIDENCE

Vocational expert ("VE") Tom King testified before the ALJ.  The VE testified that Plaintiff had worked in the past as a grill cook, fast food worker, laundry attendant, and nurse's aide.  (Tr. 54).

The ALJ described to the VE the following hypothetical individual:

We've got a younger individual, she's got a GED, exertional ability to occasionally lift 20 pounds and 10 pounds frequently.  Sit, stand and walk six of eight each for a full eight-hour day.  Push, pull, gross, fine is unlimited.  Can climb stairs, ladders and rungs.  No, no ropes or scaffolds.  She can bend, stoop, crouch, crawl, balance, stoop as well.  Gets along with others, she can understand simple instructions, concentrate and perform simple tasks and respond and adapt to work place changes and supervision but in a limited public employee contact.

The VE testified that such an individual could not perform any of Plaintiff's past work but could perform jobs such as garment sorter,[13] office cleaner,[14] and photocopy operator[15] as examples. (Tr. 55).  In response to questioning by Plaintiff's attorney, the VE testified that an individual who "would, occasionally randomly flee from the workplace environment" (Tr. 58) or "take unscheduled breaks of an hour duration" multiple times per week would be unable to maintain employment.  (Tr. 58-60).

### III.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether

---

[13] *Dictionary of Occupational Titles* (*DOT*) No. 361.687-014: 1,100 jobs available in Missouri; 185,000 jobs available nationally.

[14] *DOT* No. 323.687-014: 1,200 jobs available in Missouri; 290,000 jobs available nationally.

[15] *DOT* No. 207.685-014: 900 jobs available in Missouri; 165,000 jobs available nationally.

the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.   At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.   At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e).   At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 17, 2010, the application date. He found that she had the following severe impairments: an affective disorder, anxiety, and uterine fibroids. He found that she did not have an impairment or combination of impairments that meets or medically exceeds one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20). He found that Plaintiff had "the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) with an ability to lift and carry 20 pounds occasionally and 10 pounds frequently and sit, stand and walk 6 hours each for a full 8-hour workday. Her ability to push/pull and gross and fine dexterity is unlimited. [She] is able to climb stairs, ladders and run but should not climb ropes and scaffolds. In addition, she is able to bend, stoop, crouch, crawl, balance, twist, and squat. Mentally she is able to get along with others, understand simple instructions, concentrate and perform simple tasks and respond and adapt to workplace changes and supervision but in a limited public/employee contact setting." (Tr. 22). Relying on the testimony of the VE, he found that Plaintiff was unable to perform any past relevant work but could perform other jobs existing in significant numbers in the national economy. (Tr. 25). The ALJ therefore concluded that Plaintiff has not been under a disability, as defined in the Act, from the alleged onset date through the date of his decision. (Tr. 26).

# V.     DISCUSSION

## A.     STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).   "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).   In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*   However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).   "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B.     THE ALJ'S FINDINGS AT STEP TWO

The first issue Plaintiff raises in her appeal is whether the ALJ erred by failing to evaluate whether her migraine headaches, neck and back impairment, and obesity constituted severe impairments at Step Two of the sequential evaluation process.  To show that an impairment is severe, Plaintiff must show that she has (1) a medically determinable impairment or combination

19

of impairments, which (2) significantly limits her physical or mental ability to perform basic work activities, without regard to age, education, or work experience.  *See* C.F.R. §§ 416.920(a)(4)(ii),(c); 416.921(a).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007).  Although the requirement of severity is not an "onerous requirement," it is "not a toothless standard."  *Id.* at 707-08.

For several reasons, the Court finds that the ALJ's decision not to include headaches, neck and back impairments, or obesity among Plaintiff's severe impairments was supported by substantial evidence in the record as a whole.

First, the Court notes that Plaintiff claimed in her disability paperwork that the physical or mental conditions that limited her ability to work were "bipolar disorder, PTSD, borderline personality disorder, [and] anxiety." (Tr. 119).  She did not mention migraine headaches, neck impairments, back impairments, or obesity.  A claimant's description of her impairments in his or her disability application is a significant consideration in determining whether the ALJ has properly assessed the claimant's limitations.  *See Dunahoo v. Apfel*, 241 F. 3d 1033, 1039 (8th Cir. 2001) ("The fact that [the claimant] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed.")

Second, Plaintiff's testimony before the ALJ did not indicate that Plaintiff believed that obesity, neck impairments, back impairments, or headaches significantly limited her ability to do work activities.  Upon questioning from the ALJ and her attorney about her conditions and limitations, Plaintiff described at length numerous mental symptoms, as well as pain from PCOS.  When the ALJ asked if she was being treated physically for anything other than the PCOS, she

said, "Uh-uh."  (Tr. 39).  When he followed up, asking, "So as far as your legs and your arms and things like that, they're okay?" she said, "Yeah."  (Tr. 39).  She then mentioned that she had been in a car accident and was being treated with "muscle relaxers and a light pain medication," but she indicated that her doctor "said that it's just soft tissue damage and it will take time to heal."  (Tr. 39-40).  She also said that "some days it doesn't even hurt."  (Tr. 40).  She indicated that she had been having headaches since her car accident, but she stated that the doctor anticipated that when the underlying soft tissue damage is resolved, the headaches will go away.  (Tr. 52).  She also testified that she had a degenerative disk disease in her lower spine, but she stated that she had not seen anyone for it for a few years and was not taking any pain medication for it.   (Tr. 40-41).   She did not testify to any limitations from these alleged physical impairments, nor did she discuss any limiting effects of her obesity.

Third, consistent with Plaintiff's testimony, the medical records do not indicate that these alleged impairments caused any significant, ongoing limitations on Plaintiff's abilities.  With respect to obesity, although clinicians have noted that Plaintiff is obese, they have not stated that her obesity, alone or in combination with other impairments, limits her ability to function.  With respect to neck and back impairments, Plaintiff did complain of neck and back pain resulting from her car accident of June 28, 2010.  However, a radiology report showed no fractures, and Plaintiff's doctor apparently believed as of August 2010 that her muscles were continuing to heal and could be addressed with anti-inflammatory medications and a heating pad.  (Tr. 373, 384).  There are no later medical records indicating that Plaintiff continued to suffer limiting pain from these injuries, nor does Plaintiff's testimony so indicate.  With respect to Plaintiff's headaches, although Plaintiff complained of headaches on a few occasions in late 2009, and then again of headaches related to her June 2010 car accident, those complaints were intermittent, and the

record does not indicate that the headaches imposed significant limitations on Plaintiff's abilities. (Tr. 206, 209, 303, 305, 348, 352, 381).  In addition, CT scans of her head on January 31, 2009, and August 18, 2009, were normal.  (Tr. 353, 365).

For all of the above reasons, the Court finds no error at Step Two.

### C.    THE ALJ'S RFC DETERMINATION

The second issue Plaintiff raises in her appeal is whether the ALJ's determination of Plaintiff's RFC is based upon substantial evidence.  A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). Therefore, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  *Id.* at 712 (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).

Plaintiff first argues that the ALJ gave undue weight to the opinions of state agency reviewing experts, failed to explain the weight he gave to those opinions, and failed to support his RFC with "medical" evidence.  The Court disagrees.  The Court acknowledges that the opinion of a non-examining physician or psychologist, standing alone, does not constitute substantial evidence.  *See, e.g.*, *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004).

22

However, an ALJ may properly rely on such opinions as one part of the record where the record as a whole provides support for the ALJ's findings.  *Id.*; *see also* 20 C.F.R. § 416.927(c), (e)(2)(i).  Here, the ALJ did not rely solely upon the opinions of the state agency psychologists; rather, he properly considered them in conjunction with other evidence in the record, including medical evidence, that supported his RFC.  Before addressing the opinion of the state agency examiners, the ALJ indicated that he gave "great weight" to several reports from Plaintiff's treating clinicians, who noted on numerous occasions that Plaintiff's mood was "okay" or "stable," that her affect "normal," and/or that her other mental status indicators were normal or unremarkable.  (Tr. 23, 282; 286; 290; 294; 299; 303; 305; 414).  The ALJ also properly noted that it appeared that Plaintiff's mental impairments were being fairly well-controlled by medication, and that Plaintiff's own testimony suggested that although her medications do not eliminate her symptoms completely, they help keep her mood stable, help control her anxiety, and help her sleep.  (Tr. 23, 38).  *See Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability.").

Plaintiff's argument that the ALJ erred by failing to explain the weight he gave to the state agency psychologists' opinions is unavailing.  Plaintiff relies on *George v. Astrue*, No. 4:10-CV-02136-RWS-NAB, 2012 WL 1032973 (E.D. Mo. March 6, 2012), *Report and Recommendation adopted*, 2012 WL 1032962 (E.D. Mo. March 27, 2012), in which the magistrate judge recommended remand in part because the ALJ had not explained what weight he gave to the state agency consultant's opinion, or why he gave the opinion that weight.  *Id.* at *13.  Here, however, the ALJ specifically stated that he gave "great weight" to the state agency consultants' opinions.  (Tr. 24-25).  He also specifically recognized that although the opinions of

non-examining consultants do not generally deserve as much weight as the opinions of examiners, they deserved some weight, "particularly in a case like this in which there exist[] a number of reasons to reach similar conclusions." (Tr. 25). The ALJ also indicated that he had considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 416.927 and the relevant Social Security Rulings. These statements are sufficient to demonstrate that the ALJ adequately considered and explained the weight he gave to these opinions.

Plaintiff also argues that her GAF scores require a finding that she is more limited than the ALJ determined. Plaintiff was assigned a GAF of 40 on one occasion in 2006, and a GAF of 45 on one occasion in 2009. Although GAF scores may be relevant to the determination of RFC, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,'" and GAF scores are not dispositive. *Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) (quoting 65 Fed. Reg. 50746, 50746-65, 2000 WL 1173632 (Aug. 21, 2000)). "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." *Jones v. Astrue*, 619 F.3d 963, 974 (8th Cir. 2010) (citing *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003). Here, the ALJ specifically discussed Plaintiff's GAF score of 45 and found that it was "not supported by [the] clinical notes." (Tr. 23). For example, on the same day as the GAF score was assigned, Plaintiff's appearance, manner, speech, attitude, dress, grooming, eye contact, productivity, continuity, orientation, and judgment were deemed normal. The ALJ also found the GAF score inconsistent with Plaintiff's accounts of her daily activities, in which she indicated that she got her children off to school, visited with her boyfriend, and did not have significant difficulties in the areas of daily living. (Tr. 23, 41-45).

The Court emphasizes that it is not permitted to "reweigh the evidence presented to the ALJ." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)).  The ALJ's assessment of the state agency psychologists' opinions, Plaintiff's GAF scores, and Plaintiff's RFC were all supported by substantial evidence, including medical evidence, and fell within the available "zone of choice."  *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("[T]his Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'").

With respect to Plaintiff's physical limitations, Plaintiff also argues that the ALJ erred by failing to obtain, and base his opinion on, medical opinion evidence regarding Plaintiff's ability to function.  The Court finds no error.  Plaintiff has the burden of establishing her claimed RFC. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)).  "Although the ALJ must fairly and fully develop the record, he is not obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability."  *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (internal quotation marks and citations omitted).  Here, as discussed at length above, Plaintiff did not allege in her disability paperwork or in her testimony before the ALJ any limitations from physical impairments, much less any limitations that would limit her ability to do light work.  Moreover, the record contains numerous medical records from doctors Plaintiff visited for her physical complaints, and those records do not contain any findings suggesting that Plaintiff had any long-term physical functional restrictions.  Plaintiff failed to satisfy her burden of proving physical limitations greater than those assessed by the ALJ, and the ALJ's assessment is supported by substantial evidence.

### D.      THE ALJ'S CREDIBILITY ANALYSIS

The third issue Plaintiff raises in her appeal is whether the ALJ's analysis of the credibility of Plaintiff's subjective complaints was supported by substantial evidence.

In determining a Plaintiff's RFC, "'the ALJ first must evaluate the claimant's credibility.'"   *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002).  When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."  *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).   "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'"  *Id.* (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).  However, the ALJ need not explicitly discuss each factor.  *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).  It is sufficient if the ALJ "'acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Id.*

Here, although the ALJ did not expressly discuss each *Polaski* factor, it is clear that he considered several of the factors and made an express credibility determination before discounting Plaintiff's subjective complaints.  (Tr. 22-25).  First, the ALJ noted that Plaintiff's reported daily activities were inconsistent with her allegations of disability.  (Tr. 23).  Plaintiff stated that she had friends over "all the time" to watch movies, was able to leave home to go

shopping for one to two hours a week, and was able to cook and do laundry for her children.  (Tr. 151-55).  Although these activities are not inconsistent with some level of impairment, they do weigh against Plaintiff's suggestion that she had disabling impairments.

Second, the ALJ noted that Plaintiff's psychiatric symptoms appeared to be largely controlled with medication.  (Tr. 23).  Plaintiff's own testimony suggested that although her medications do not eliminate her symptoms completely, they help keep her mood stable, help control her anxiety, and help her sleep.  (Tr. 38).  Moreover, Plaintiff has often reported that her symptoms were being controlled with medication or that she was feeling better.  (Tr. 211, 231, 286, 296, 307, 322, 324).  As discussed above, impairments that are controllable with medication do not support a finding of disability.  *See Davidson*, 578 F.3d at 846.  The ALJ also discussed the claimed side effects of Plaintiff's medications but noted that there was no evidence that she had complained of significant or ongoing side effects to her treaters.  (Tr. 24).

Third, the ALJ considered that Plaintiff's subjective complaints were inconsistent with the medical evidence.  Plaintiff's clinicians have repeatedly described her mood as "okay" or "stable" (Tr. 282, 286, 290, 294, 299, 303, 305, 414).   In addition, objective tests and examination have often failed to reveal physical abnormalities supporting the existence of disabling impairments.  (Tr. 348, 352, 364, 373).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by objective medical evidence, such complaints may be found not credible if they are inconsistent with the record as a whole.  *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

"If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008).  Here, the ALJ explicitly discredited Plaintiff's subjective complaints

and supported that decision with substantial evidence in the record, and the Court defers to his assessment.

## VI.   CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

A separate judgment in accord with this Memorandum Opinion is entered this date.


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this 23rd day of July, 2013.